IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

DEANNA BLAIR NICKOLS,            §
aka DeAnna Nickols Territo,      §
aka DeAnna Blair Territo,        §
(TDCJ No. 842698)                §
                                 §
VS.                              §  CIVIL ACTION NO.4:08-CV-137-Y
                                 §
                                 §
GARY MORRIS, et al.              §

OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND
RESOLVING ALL PENDING MOTIONS AND RELATED MATTERS

In this case, inmate/plaintiff DeAnna Blair Nickols has claims

remaining against two individual defendants: Gary Morris and

Patrick Dean Smith.[1]  These defendants have now filed a motion for

summary judgment, along with a brief in support and an appendix.

By the combined motion for summary judgment, Morris and Smith

assert a qualified-immunity defense to Nickols's claims that they

subjected her to an unlawful seizure and excessive force in

violation of her rights under the Fourth Amendment and were

deliberately indifferent to her serious medical needs in violation

of the Eighth Amendment.  For the reasons set forth herein, the

Court concludes that the motion for summary judgment must be

granted as to each defendant.

---

[1]The Court previously dismissed, under authority of 28 U.S.C. §§ 1915A and
1915(e)(2)(B), Nickols's claims against the Palo Pinto County Sheriff's
Department and the State of Texas, Game Warden Division.  Also, upon an agreed
motion, the Court dismissed her claims against Game Warden Bill Jones.

*Related motions*

Although Nickols did not timely file a response to the motion for summary judgment, she filed several related motions, including a late-filed motion for extension of time to file a response to the summary-judgment motion, and eventually a response to that motion. The defendants have challenged Nickols's motions and her late-filed response. The Court will first resolve all motions related to the summary-judgment issues and clarify the matters that will be considered in ruling on the motion for summary judgment.

The motion for summary judgment was supported by an appendix containing a DVD showing approximately 25 minutes of video images from defendant Gary Morris's in-car camera recording of the events made the basis of this complaint. Nickols initially filed two motions, a motion to be bench warranted, and a request for a court order to obtain certain evidence. These motions were primarily focused on Nickols's request to view the DVD. As a result of counsel for co-defendant Bill Jones's arranging for Nickols to view the DVD at her institution of confinement, Nickols acknowledges in her February 1, 2010, response to the motion for summary judgment that she was able to view the DVD on two occassions. As a result, Nickols's motion to be bench warranted and her motion to obtain evidence will be denied as moot.[2]

---

[2]Although the motion to obtain evidence also sought production of other records, as Nickols did not demonstrate that such evidence was related to the claim of qualified immunity, and as the video images provide an accurate record

Nickols also filed a motion for an extension of time to respond to the motion for summary judgment supported by her allegation that she had not yet had an opportunity to view the DVD. After she had a chance to review the DVD in late January, Nickols filed a nineteen-page (plus exhibits) response on February 1, 2010. Although the defendants have moved to strike the whole response, because the defendants rely extensively on the facts as shown on the DVD, and as it appears to the Court that the DVD is an accurate record of the events as they happened, the Court concludes that Nickols's motion for an extension should be granted and the Court will consider, in reviewing the summary judgment motion, Nickols's February 1, 2010, nineteen-page response.

Attached to Nickols's response, however, are six papers that she lists as exhibits.  The defendants have filed a motion to strike objecting to these papers on the grounds that they contain inadmissible hearsay, are not properly authenticated, and are irrelevant to the issues in this case.  The motion to strike is granted and the Court will not consider the exhibits attached to Nickols's February 1, 2020, response in ruling on the summary-judgment motion.

Nickols has also filed a "Motion to Amend Summary Judgment by Attaching pages 20, 21, 22, and 23."  Upon review, it is apparent that the motion is essentially a request by Nickols to supply an

of what transpired, the motion for discovery of other evidence is DENIED.

additional four pages of legal argument to her nineteen-page response. This time, however, Nickols cites no reason why she could not have listed the arguments recited in these proposed "amended" pages at the time she filed the February 1, 2010, response. As such, the Court concludes that Nickols's motion to amend must be denied.

Nickols has also filed another motion for appointment of counsel. Nickols did not cite any authority for her request, but since she is proceeding under 28 U.S.C. § 1915, the Court construes her motion as seeking counsel pursuant to the provisions of 28 U.S.C. § 1915(e)(1).[3] Section 1915(e)(1) authorizes the Court to appoint an attorney to represent a plaintiff proceeding in forma pauperis. There is no absolute right to an attorney in § 1983 cases, however, and a motion for appointment of an attorney under § 1915 should not be granted absent exceptional circumstances.[4] Four factors are to be considered: "(1) the type and complexity of the case; (2) whether [Nickols] is capable of adequately presenting [her] case; (3) whether [Nickols] is in a position to investigate adequately the case; and (4) whether the evidence will consist in large part of conflicting testimony so as to require skill in the

---

[3] Section 28 U.S.C. § 1915(e)(1) provides: "[t]he court may request an attorney to represent any person unable to afford counsel."

[4] *Vinson v. Heckmann*, 940 F.2d 114, 116 (5th Cir. 1991); *Hulsey v. Texas*, 929 F.2d 168,172 (5th Cir. 1991); *Jackson v. Dallas Police Dep't*, 811 F.2d 260, 261 (5th Cir. 1986).

4

presentation of evidence and in cross examination."[5]

After consideration of the motion for appointment of counsel under the exceptional-circumstances standard and the enumerated factors, the Court concludes that the motion must be denied. The case is not complex and Nickols is capable of and has presented the facts as she alleges they took place. Furthermore, there is no need for extensive investigation and there is no need to resolve extensive conflicts in testimony, as the controlling and dispositive evidence in this case is presented through an objective video of the events made the basis of Nickols's complaint.

*Summary-Judgment Evidence*

Thus, the Court will recap the materials reviewed in consideration of the motion for summary judgment. The appendix to the summary-judgment motion includes: the October 14, 2009, Affidavit of Gary Morris (exhibit 6), along with three pages of Palo Pinto County Sheriff's Office records (exhibit 1), three complaints charging Nickols with violations of law (exhibits 2-4), and a DVD containing a video recording from Gary Morris's in-car camera (exhibit 5); and the October 14, 2009, Affidavit of Patrick Dean Smith. As the exhibits attached to Nickols's response were stricken, they have not been considered in resolving the summary-judgment motion. Because Nickols expressly declared that her June

---

[5]*Ulmer v. Chancellor,* 691 F.2d 209, 213 (5th Cir. 1985).

5

17, 2008, amended complaint; her August 13, 2008, more definite statement; and her September 21, 2009, Rule 7(a) replies, were true and correct under penalty of perjury, this Court is required to consider those documents as competent summary-judgment evidence.[6]

### Summary-Judgment Standard

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[7] The party moving for summary judgment has the initial burden of informing the Court of the basis for his motion and producing evidence which tends to show that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law.[8] Once the moving party has made such a showing, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.[9] Whether an issue is "gen-uine" is a determination of whether it is "real and substantial, as

---

[6]See Nissho-Iwai American Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1989).

[7]FED. R. CIV. P. 56(c)(2).

[8]See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, Inc.  477 U.S. 242, 248 (1986).

[9] Id., at 322-23; Anderson, 477 U.S. at 257.

opposed to merely formal, pretended, or a sham."[10]   A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.[11]   No genuine issue of material fact exists if no rational trier of fact could  find for the nonmoving party based on the evidence presented.[12]  A Court must generally consider all evidence in the light most favorable to the nonmoving party.[13]  Nevertheless, the Supreme Court held that where a videotape exists that discredits the nonmoving party's version of events so that no reasonable jury could believe it, a court is required to view the facts in the light depicted by the videotape.[14]

*Facts as Shown on the Videotape*

Guided by the Supreme Court's recognition that the facts captured on a videotape can be dispositive when the underlying

---

[10]*Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir. 2001)(noting that only genuine and substantial issues may subject a defendant to the burden of trial in qualified immunity context)(quoting *Wilkinson v. Powell,* 149 F.2d 335, 337 (5th Cir. 1945).

[11]*See Anderson,* 477 U.S. at 248.

[12]*See National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 712-13 (5th Cir. 1994).

[13]*See Id.* at 713.

[14]550 U.S. 372, 380-81 (2007).

(When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.... Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.")

facts are in dispute, the Court has carefully reviewed and chronicled the events as shown on the DVD video recording. All images recorded on the DVD are from a single camera inside officer" Gary Morris's patrol vehicle looking towards the area where Nickols's pick-up truck is parked at the side of the road. Morris's car is facing the front of Nickols's vehicle. The angle of view is a wide-angle image inclusive of the truck on the left side of the frame and the roadway in the middle and right side of the frame. Officer Morris wears a microphone. Thus, all of his statements and exclamations are heard throughout the whole recording, even when he is not in the frame. The microphone sometimes picks up the audio of other persons and sounds.

The recording begins with an encoded time of 18:53:00 with an image of a pick-up truck pulled over, and Nickols sitting in the driver's side of the cab, moving her head and upper body constantly. Although it is nighttime, the lights of the truck are not turned on, but the wiper-blades are operational, even though it is not raining. (DVD 18:53-55.) The light shining from Morris's car towards the truck washes out with bright light some of the detail of Nickols's face. Audio indicates that a dispatcher identifies the woman as Deanna Blair Torrito.[15]   (18:55:53.) Officer Morris walks to the driver's side and asks Nickols to step out. (18:56:34) Morris then opens the door and says "come on out,"

---

[15]Nickols is also known as DeAnna Blair Territo.

8

and an object falls out of the door and to the pavement. (18:56:50) Morris then repeatedly tells Nickols to leave her purse, because she at first does not comply. (18:57:10) Morris asks Nickols what is in her hand, and she comments that her money is everywhere. (18:57:27) Morris begins to insist that she let go of what she has in her hand, and she says "it's just money." (18:57:41) Morris then begins to physically restrain Nickols's hands, although the open door of the truck bars the view of exactly what he is holding. (18:57:55) Nickols says "what are you doing to me," and Morris responds, "I am going to pepper spray you if you don't quit." (18:58:00) Nickols repeatedly says "you are hurting me." (18:58:13) Morris quietly restrains her, then gets out his radio and calls for back-up saying "this subject is fighting me-give me a back-up please." (18:58:29) Morris then continues to restrain Nickols in the open doorway for approximately one minute and twenty seconds until other officers arrive. (18:58:35-18:59:50) Morris then informs the other officers that Nickols has "blood on her right hand," and that he believes  "she swallowed the dope." (19:00:07) The two officers then pull Nickols away from truck and place her in handcuffs, and Morris immediately walks away from her. (19:00:45) Morris walks in front of his dashboard camera with noticeable blood on his right hand. (19:00:48)  Three other officers arrive and walk up to where Nickols is standing, and one of them picks up the item that dropped from the cab of the pick-up truck. (19:01:05) Nickols is left standing alone, untouched by officers but with her hands

restrained behind her back. (19:01:15)  Morris then walks back into the area where Nickols is standing with officers and asks them to "look in her mouth and see what she is chewing on." (19:01:30)  The other officers begin to look into Nickols's mouth with their flashlights and, as she bends away, they start yelling "spit it out!"  Then, two of the officers grab Nickols. (19:01:52)  The officers then continue to restrain Nickols in an upright position behind the door of the cab, repeatedly telling her to "spit it out," and one of the officers tells her she will eventually produce the substance either by "vomiting" it up or "crapping" it out. (19:02:00 – 19:02:50)

Defendant Patrick Dean Smith then arrives. (19:02:37) Officer Smith puts on plastic gloves and walks around to where the other officers are holding Nickols. (19:03:10) Then, Morris and Smith both reach over to Nickols's head and facial area. (19:03:15) Nickols begins to moan and grunt incoherently due to the substance in her mouth. (19:03:19) The officers, including Morris and Smith, then push Nickols down to the ground. (19:03:20) Nickols exclaims "what are you doing to me ?" and continues to moan and grunt. (19:03:24-31) One officer then leans on her legs as the others hold her torso down. (19:03:31) The officers continue to order Nickols to "spit it out," and Nickols exclaims "you're hurting me." (19:03:35-19:04:10) Smith then gets up and walks away from Nickols and towards the camera, while the other officers lift Nickols to her feet and let her stand alone. (19:04:12) Smith then places the

substance retrieved from Nickols's mouth on the hood of Morris's police car. (19:04:21) Nickols continues to stand alone and mumbles while officers tell her to "just shut up." (19:04:35)

Morris then begins to tell Smith what happened, and when Smith inquires of Morris "Did you pop her in the chops?," Morris answers "she was bleeding from her right hand real bad and I was afraid to let her go; I was not sure where the blood was coming from, so I was just holding on to her." (19:04:55-19:05:03) Morris next states that he "just held on to her, 'cause I did not know what was going on." (19:05:20) Morris then informs Nickols that she is under arrest.(19:05:30) When Morris asks Smith what did she end up spitting out, Nickols volunteers "a 100 dollar bill." (19:05:35) Smith and Morris then look closely at the substance, and Smith describes to Morris that he just got a hold of Nickols "right behind her ear and pushed and she just spit it out." (19:05:58) Morris then asks another officer to call EMS to the scene to attend to Nickols. (19:06:40) Smith and another officer then remove items from Nickols's pockets, while Morris and another officer search the cab of the truck. (19:07:05) For several minutes, as the officers continue to search and discuss what they find, Nickols makes no noises, grunts, screams or complaints and is allowed to stand untouched except for her hands' being cuffed behind her back. (19:06:45-19:10:50) Officers then touch Nickols's hair gently to search for items. (19:10:50) Officers then discover she has two separate identification documents and inquire of her why the names are

different. (19:12:00) Morris next reads Nickols her rights. (19:12:45) When Morris then asks her "where's the dope ?" Nickols answers "I don't have any, I promise I don't." (19:13:15)  The officers then try different field tests on the substance taken from Nickols's mouth; and after a negative test for methamphetamine, they run a field test for crack cocaine, which then shows positive for crack cocaine. (19:13:30-19:17). The paramedic then arrives, speaks to Nickols, make notes on a chart, and then begins to examine her hands. (19:16:00-17:00) One officer then announces to the others that the field test of the substance removed from Nickols's mouth reveals positive for crack cocaine. (19:17:05) The recording then ends. (19:18:00)

*Analysis--Qualified Immunity*

Defendants seek summary judgment on the basis that they are entitled to qualified immunity from each of Plaintiff's claims of constitutional violations.  Qualified immunity protects government officials performing discretionary functions from personal liability as long as their conduct violates no clearly established constitutional or federal statutory rights.[16]  To overcome an official's immunity from suit, a plaintiff must allege the violation of a right so apparent or so obvious that a reasonable official would understand that what he is doing violates that

---

[16]*See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sorenson v. Ferrie*, 134 F.3d 325, 327 (5th Cir. 1998).

right.[17]  In *Saucier v. Katz,*[18] the Supreme Court mandated a two-step sequence to resolve a qualified-immunity claim: first, a court determines whether the facts alleged or shown state a violation of a constitutional right; second, a court must decide whether the right was clearly established at the time of the defendant's conduct.[19] In the recent case *Pearson v. Callahan,*[20] however, the Supreme Court retreated from this sequential approach:

> while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.[21]

Although *Pearson* thus authorizes this Court to resolve the qualified-immunity issue through analysis under the second step, the Court concludes that it is appropriate in this case to address and analyze the first step of the qualified immunity inquiry.[22]


*Fourth Amendment--Unlawful Seizure*

Nickols asserts a claim that her seizure was unlawful.  A

---

[17]*See Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

[18]533 U.S. 194 (2001).

[19]*Id.* at 201.

[20]129 S.Ct. 808 (2009).

[21]*Id.* at 818.

[22]*See generally Pearson,* 129 S.Ct. at 821 ("Our decision does not prevent the lower courts from following the Saucier procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases.")

Fourth Amendment seizure occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."[23]  In this case, there is no question that Nickols was seized for Fourth Amendment purposes when she was restrained, handcuffed, and forcibly made to release and spit out contraband from her mouth. A seizure will be upheld as constitutional if it is found to be reasonable.[24] The reasonableness of a seizure requires a balancing of the nature and quality of the intrusion on the individual against the government's interests alleged to justify the intrusion.[25]

The Court concludes that Nickols's seizure was reasonable in light of the circumstances; thus, she has failed to assert a violation of her constitutional right to be free from unreasonable seizure. Nickols was charged with three violations of law after the incidents made the basis of this suit: interfering with the duties of a peace officer; tampering with physical evidence; and knowingly possessing a controlled substance, namely, crack cocaine, in an amount less than one gram. (Ex. 2-4.) Nickols was convicted of tampering with physical evidence. (More Definite Statement, attachment.) The video evidence reveals that Nickols's vehicle was

---

[23]*Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968); *United States v. Clay*, 640 F.2d 157, 159 (8th Cir. 1981) (stating that restriction of freedom to leave "by physical restraint or by sufficient show of authority" effects a seizure).

[24]*See Holland ex. Rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001), *cert. den'd*, 535 U.S. 1056 (2002); *see also Baker v. Monroe Township*, 50 F.3d 1186, 1191-95 (3rd. Cir. 1995).

[25]*See Holland* 268 F.3d at 1188-89; *Levito v. Lapina*, 258 F.3d 156, 166 (3d Cir. 2001).

pulled over and, although it was dark, she had no headlights on. Also, although it was not raining, the wiper blades were operating. The video reveals that Nickols was continuously and nervously moving around in her vehicle, which is consistent with a person using narcotics. Observations of these facts gave Morris sufficient basis to approach the vehicle, whereupon he observed Nickols's shuffling several $100.00 bills and fumbling with her purse.  She initially refused to leave her purse alone and step out of her car. Then, as Morris opened the door, a glass pipe fell out of the vehicle to the ground, and Morris observed Nickols's attempting to hide and withhold what later was determined to be a $100.00 bill wrapped around crack cocaine. Nickols's actions in failing to respond to Morris's requests, and then her attempts to keep evidence from his discovery, justified his physical restraint of her until other officers arrived and further justified the placement of handcuffs upon her once the other officers did arrive. Morris had sufficient reason initially to believe that Nickols had violated traffic laws and then had reasonable basis to believe she was using and or in possession of narcotics.  Nickols has failed to show that Morris's seizure and restraint of her until other officers arrived rose to the level of a constitutional violation.

*Fourth Amendment--Excessive Force*

A claim of excessive force in the course of making a seizure of a person is "properly analyzed under the Fourth Amendment's

'objective reasonableness' standard."[26] To state an excessive-force claim under the Fourth Amendment, Nickols must show that she (1) suffered some injury, that (2) resulted directly from force that was clearly excessive to the need for force, and (3) the use of that force was objectively unreasonable.[27] The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene."[28] "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."[29] In the specific context of reviewing an officer's use of force upon a suspect who is hiding evidence, even when an officer knows that a "suspect is concealing contraband, [that] does not authorize government officials to go to any and all means at their disposal to retrieve it."[30] Rather, officers may adopt reasonable

---

[26]*Scott,* 550 U.S. at 381(citing *Graham v. Connor,* 490 U.S. 386, 388 (1989).

[27]*Bush v. Strain,* 513 F.3d 492, 500-01 (5th Cir. 2008); *see also Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999), *decision clarified on rehearing,* 186 F.3d 633 (5th Cir. 1999).

[28]*Graham,* 490 U.S. at 395-96; *see also Gross v. Pirtle*, 245 F.3d 1151, 1158 (10th Cir. 2001)(recognizing that the officer may be "'forced to make split-second judgments' under stressful and dangerous conditions")(citing *Graham*, 490 U.S. at 396-97).

[29]*Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S.1, 8 (1985)).

[30]*United States v. Cameron,* 538 F.2d 254, 257 (9th Cir. 1976).

16

measures to retrieve contraband and prevent its destruction.[31] Although police officers can use reasonable force to prevent the swallowing of evidence,[32] they may not constitutionally beat and choke suspects in order to gain that evidence.[33]

Two decisions of the United States Court of Appeals for the Fifth Circuit are particularly instructive to define the limits of force permitted to be used by an officer attempting to extract evidence from a suspect's mouth. In *Espinosa v. United States*,[34] the court of appeals reviewed a defendant's challenge to the seizure of evidence without a warrant where officers obtained evidence as the defendant was attempting to swallow narcotics.   The officers obtained the evidence "by grabbing the defendant about his throat, choking him and attempting to pry open his mouth by placing pressure against his jaw and nose."[35] The *Espinosa* court affirmed the district court's finding that no more force was used than was

---

[31]*Thompson v. Sarasota County Police Department,* No.8:09-CV-585-T-30TBM, 2009 WL 1850314, at *4 (M.D.Fla. June 26, 2009)(citing *State v. Desmond,* 593 So.2d 965, 969 (La. App. 4th Cir. 1992).

[32]*Ellis v. Columbus Police Department, et al.,* NO. 1:07-CV-124-A-A, 2009 WL 1663454 (N.D.Miss. June 15, 2009)("If a suspect attempts to swallow evidence, law enforcement officers may hold his throat and pinch his nose shut in an attempt to retrieve the evidence")(citing *Espinoza v. United States,* 278 F.2d 802 (5th Cir. 1960); *Linicom v. Director, TDCJ-ID,* No. 6:06CV440, 2008 WL 112111, at *5 (E.D.Tex. Jan. 7, 2008)(noting that with probable cause, an officer may search a suspect's mouth for drugs)(citing *Williams v. Bramer,* 180 F.3d at 704).

[33]*Thompson,* 2009 WL 1850314, at *4; *People v. Fulkman,* 286 Cal.Rptr. 728, 732-33 (Cal. Ct. App., 4th Dist., 1991)(noting that there is no constitutional right to destroy evidence, and that to prevent its destruction police may reach into a person's mouth to recover evidence if there is sufficient probable cause to believe a crime is being committed)(citations omitted).

[34]278 F.2d at 803.

[35]*Id.*

---

necessary under the circumstances.[36]

In *Williams v. Bramer,*[37] the court of appeals reviewed the evidence of two separate choking incidents where an officer (Bramer) suspected the detainee (Williams) of hiding evidence in his mouth. The district court granted summary judgment to Bramer on the basis of qualified immunity. On the first occasion, Bramer, after having looked in suspect Williams's mouth and car, then grabbed Williams's throat, told him "let me see what's under your tongue," choked him, and told him to "spit it out." Williams claimed that this resulted in his having problems breathing and caused him to be unable to swallow and to feel dizzy. As Bramer loosened his grip, Williams threatened to report him to internal affairs, whereupon Bramer again began choking Williams until a fellow officer arrived.[38] The court of appeals affirmed the grant of summary judgment on the challenge to the first choking incident, but reversed as to the grant of summary judgment on the second choking because of the officer's clear lack of any basis to continue physical restraint of Williams:

> With respect to the alleged choking that occurred while Bramer attempted to search Williams['s] mouth, we must conclude that it is not a cognizable injury. Whenever a detainee is physically searched by an officer, a physical confrontation inevitably results. In such circumstances, we cannot conclude that the alleged injury that resulted

---

[36]*Id.*

[37]180 F.3d at 699.

[38]*Id.* at 702-03.

from the contact at issue here--that is, fleeting
dizziness, temporary loss of breath and coughing--rises
to the level of a constitutional violation.

With respect to the second choking, however, we do find
that the alleged injury is sufficient to assert a
constitutional violation. Based on the facts that we must
accept as true on appeal, Bramer's second choking of
Williams was motivated entirely by malice. Bramer was
therefore not legitimately exercising force in the
performance of his duties as an officer.[39]

The video evidence captures the force used in this case.
Morris physically restrained Nickols for approximately two minutes
while awaiting other officers. Contrary to Nickols's pleadings,
Morris never struck, kicked, or hit Nickols during that time.
Rather, he calmly reached for his radio and said in a measured tone
"this subject is fighting me, give me back-up please." Once the
other officers arrived and assisted Morris in placing Nickols in
handcuffs, they then left her untouched, standing alone for about
a minute and a half until Morris asked the officers to look in her
mouth to see what she was chewing on. Then, for another
approximately two minutes the officers looked into Nickols's mouth

---

[39]*Id.* at 704.   On rehearing, the court of appeals clarified that its
reference to a motivation of malice was to point out the absence of any valid
reason for Bramer to have continued physical contact with Williams:

Based on the procedural posture of the appeal, we had to assume that
Bramer, after conducting a search of Williams and while detaining
him in his official capacity, choked him for no apparent law
enforcement related purpose. Regardless of whether that conduct is
motivated by malice or some other sentiment, it is sufficient to
permit Williams to allege a Fourth Amendment violation in this
instance.

*Williams v. Bramer,* 186 F.3d 633 (5th Cir. 1999).

and aggressively yelled at her to "spit it out" and that she had to provide the substance. After defendant officer Smith arrived, both he and Morris physically touched Nickols's facial area and, along with the other officers, lowered her to the ground and restrained her torso and legs until Smith walked away from Nickols with the substance. Once the substance was retrieved from Nickols's mouth, the officers immediately lifted her back up and allowed her to stand alone. Nickols was held on the ground for less than one minute. Contrary to Nickols's allegations in her pleadings, at no point was she "slammed" to the pavement, and at no point did any officer strike her.  The video reveals no movement of hands or feet that would indicate any hitting or kicking of Nickols by either defendant or any other officer.

The defendants repeatedly gave Nickols the chance to spit out the contraband and she refused. When she failed to do so, they used only the force necessary to cause her to produce the narcotics and money. The video evidence shows that Nickols was not choked, she was not on the verge of unconsciousness, and neither defendant engaged in any malicious or aggressive use of force. Rather, after she was initially handcuffed, Morris spent several minutes looking for hand sanitizer and paper towels to clean his hands.  Although Morris touched Nickols again, it was in joining other officers to mutually restrain her while Smith initiated a pressure-point technique that caused Nickols to release the contraband from her mouth.  The defendants took reasonable measures to obtain the

evidence from Nickols and did not use excessive force in attempting to retrieve the evidence and prevent its destruction.

*Eighth Amendment and Fourteenth Amendments*

Nickols asserts violation of her rights under the Eighth Amendment, alleging that she was not given proper medical attention and was not taken to a hospital for several days after her arrest. But the actions complained of in this case all took place during Nickols's arrest and then detention pending charges in Palo Pinto County, Texas. Thus, the defendants cannot be liable under the Eighth Amendment.[40]

The constitutional rights of a pre-trial detainee flow from the procedural and substantive guarantees of the Fourteenth Amendment.[41] The Fourteenth Amendment protects the detainee's right to be free from punishment prior to an adjudication of guilt.[42] The Court will review Nickols's allegations regarding denial of medical care under the Fourteenth Amendment. The applicable legal standard in the Fifth Circuit governing a pre-trial detainee's Fourteenth Amendment claim depends on whether the claim challenges a

---

[40]*See Austin v. Johnson,* 328 F.3d 204, 210 (5th Cir. 2003)("State defendants do not incur Eighth Amendment liability unless "the individual was being held in custody after criminal conviction")(quoting *Johnson v. City of Dallas,* 61 F.3d 442, 444 (5th Cir. 1995)).

[41]*Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525-26 (5th Cir. 1999).

[42]*See Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979).

'condition of confinement' or an 'episodic act or omission.'[43] A condition-of-confinement case is a constitutional attack on "general conditions, practices, rules, or restrictions of pretrial confinement."[44] A claim of episodic act or omission occurs when the "complained-of harm is a particular act or omission of one of more officials."[45] As Nickols claim involves specific events, it is reviewed under the standards applicable to an episodic act or omission.

The Fifth Circuit has held that the deliberate-indifference standard normally associated with Eighth Amendment claims also applies with respect to episodic-act-or-omission claims by pretrial detainees.[46] Under that standard, a detainee is required to allege facts that indicate officials were deliberately indifferent to his health or safety.[47] A detainee is required to establish that the defendant official has actual subjective knowledge of a substantial risk of serious harm but responds with deliberate indifference to that risk.[48]   Such a finding of deliberate indifference, though,

---

[43]*Olabisiomotosho,* 185 F.3d at 526; *see also Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir. 1996), *appeal after subsequent remand,* 135 F.3d 320, 327 (5th Cir. 1998).

[44]*Hare,* 74 F.3d at 644; *see also Scott v. Moore,* 114 F.3d 51, 53 (5th Cir. 1997)(*en banc*)(citing as examples such claims as "the number of bunks in a cell or his television or mail privileges").

[45]*Scott,* 114 F.3d at 53.

[46]*Hare*, 74 F.3d at 647-48.

[47]*Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

[48]*Hare,* 74 F.3d at 643 and 650.

22

"must rest on facts clearly evincing 'wanton' actions on the parts of the defendants."[49] This subjective deliberate-indifference standard is now equated with the standard for criminal recklessness:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference.[50]

A review of the factual record indicates that Nickols has not stated any claims against either defendant Morris or Smith supported by allegations of deliberate harm or wanton disregard of her rights to medical care. Both defendants have sworn that after Nickols was arrested she was booked into the Palo Pinto County jail, and once detained there, they had no role in determining whether she was to receive medical attention. (Morris Affidavit (Ex. 6) at 3; Smith Affidavit (Ex. 7) at 3.) Furthermore, the video evidence shows that the officer defendants called for paramedics to evaluate and address any injuries sustained by Nickols within three minutes after they had obtained the drugs from her mouth. The paramedics arrived within nine minutes and began attending to Nickols. (DVD Ex. 5, at 19:06:40; 19:15:40) The video shows paramedics assessing Nickols. As this evidence demonstrates that

---

[49]*Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985); *see also Wilson v. Seiter,* 501 U.S. 294, 297 (1991).

[50]*Farmer,* 511 U.S. at 837; *see also Hare,* 74 F.3d at 648.

both Morris and Smith were still present when Nickols was evaluated by emergency medical personnel, and as she does not show that these defendants were responsible for her medical care once she was taken to jail, she has failed to demonstrate a violation of her Fourteenth Amendment rights.

In sum, the undisputed, competent summary-judgment evidence reveals that Nickols was not unlawfully seized in violation of the Fourth Amendment, was not the victim of excessive force in violation of the Fourth Amendment, and was not subjected to deliberate indifference to her right to medical care in violation of the Eighth or Fourteenth Amendments. Defendants Morris and Smith are entitled to summary judgment based on qualified immunity because Nickols has not satisfied the first element of the qualified-immunity analysis.

*ORDER*

Therefore, Nickols's October 30, 2009, request to be bench warranted (docket no. 64), and her November 2, 2009, motion to request Court order to obtain evidence (docket no. 65), are DENIED.

Nickols's December 30, 2009, motion to extend time to respond (docket no. 68) is GRANTED, and the Court has considered the February 1, 2010, nineteen-page response in reviewing the summary-judgment motion.

Defendants' February 4, 2010, motion to strike (docket no. 75) is GRANTED, and the six pages of exhibits attached to Nickols's

February 1, 2010, response are stricken and not considered in reviewing the summary-judgment motion.

Nickols's February 8, 2010, motion to amend summary judgment (docket no. 76), and her February 22, 2010, motion to appoint counsel (docket no. 77), are DENIED.

The October 20, 2009, motion for summary judgment of defendants Gary Morris and Patrick Dean Smith (docket no. 63) is GRANTED.

Plaintiff shall take nothing on her remaining claims against defendants Gary Morris and Patrick Dean Smith, and such claims are DISMISSED WITH PREJUDICE.

SIGNED April 8, 2010.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE